**August AASMA, et al., Plaintiffs–Appellees,**

v.

**AMERICAN STEAMSHIP OWNERS MUTUAL PROTECTION AND INDEMNITY ASSOCIATION, INC. (94–3883); West of England Owners Mutual Protection and Indemnity Association, Inc. (94–3881), Defendants–Appellants.**

Nos. 94–3881, 94–3883.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 8, 1996.

Decided Aug. 29, 1996.

Leonard C. Jaques, Alan Kellman (briefed), Michael J. Connor (argued), Jaques

Admiralty Law Firm, Detroit, MI, for August Aasma in No. 94-3881.

Mark E. Solomons (argued and briefed), Arter & Hadden, Washington, DC, Irene C. Keyse-Walker, Henry E. Billingsley, II, Arter & Hadden, Cleveland, OH, for West of England Owners Mutual Protection and Indemnity Association, Inc. in No. 94-3881.

Alan Kellman (briefed), Michael J. Connor (argued), Jaques Admiralty Law Firm, Detroit, MI, for August Aasma in No. 94-3883.

John S. Rea (briefed), Sean P. Allan, Meyers, Hentemann, Schneider & Rea Co., Cleveland, OH, Richard H. Brown, Jr. (argued and briefed), Kirlin, Campbell & Keating, New York City, for American Steamship Owners Mutual Protection and Indemnity Association, Inc. in No. 94-3883.

Before: MERRITT, Chief Judge; BOGGS, Circuit Judge; O'MEARA, District Judge.[*]

MERRITT, Chief Judge.

This appeal presents questions of law and policy at the intersection of maritime, insurance, contract, bankruptcy, and international law. The chief issue is whether an association of shipping companies, created for the purpose of providing an unusual form of indemnity insurance to its member companies, must pay out claims to a group of injured seamen on behalf of a former member company that is now bankrupt and defunct. Although the District Court found that the associations are liable to the seamen, we disagree, and therefore reverse.

## I. Facts and Procedural History

Plaintiffs are a group of merchant mariners who claim injury resulting from exposure to asbestos during their service aboard ships owned by States Steamship Co. ("States"). States had been insured by defendants, two protection and indemnity associations ("Associations"), West of England ("West") and American Steamship ("American"). States was a member of West from 1959 to 1975 and a member of American from 1975 to 1980.

Plaintiffs filed personal injury lawsuits against States in 1986 in the Northern District of Ohio, but States had filed for bankruptcy in California in 1979, and, by 1986, existed only as a shell corporation with a letter drop in San Francisco. Because States never answered plaintiffs' complaints, defaults were entered in late 1990. The bankruptcy was officially closed in 1991, and States no longer exists.

Two months after the defaults were entered, plaintiffs filed the action for declaratory judgment against West and American that is the subject of this appeal. Plaintiffs sought a declaration that they could proceed directly against the Associations for payment of their asbestosis claims despite a "pay first" (or "pay-to-be-paid") clause in the policies between States and the Associations. The "pay first" clause, which is not a clause normally found in insurance policies, states that the Associations must indemnify States only in the event that States "shall become liable to pay and *shall pay*" damages for events covered by the contract (emphasis added).

West sought a stay of the action pending arbitration, citing the arbitration clause in its contract with States. The Magistrate Judge granted the stay in March 1992, applying it to proceedings against both West and American. The District Court reversed the stay and later granted plaintiffs the right of direct action against both defendants.

As an alternative remedy, the District Court appointed a receiver to initiate a so-called *Liman* plan. In *Liman v. American Steamship Owners Mutual Protection and Indemnity Ass'n*, the court permitted the Trustee of a bankrupt shipping company to defend lawsuits brought by injured sailors on the condition that, in the event of recovery, the claimants would refund $1,000 to the estate. 299 F.Supp. 106 (S.D.N.Y.1969), *aff'd*, 417 F.2d 627 (2d Cir.1969), *cert. denied*, 397 U.S. 936, 90 S.Ct. 946, 25 L.Ed.2d 116 (1970). This plan would allow the Trustee to

[*] The Honorable John Corbett O'Meara, United States District Judge for the Eastern District of Michigan, sitting by designation.

pay the claimants with proceeds from the company's indemnity insurance without creating an illegal preference in bankruptcy.

In this case, the bankruptcy has been closed for five years, and no assets exist with which to pay either the principal of the claims or the deductibles. Citing *Liman*, the District Court conceived a plan by which a receiver for States could borrow the money to pay out the sailors' claims, thus complying with the "pay first" clause, and then secure payment from the Associations.

## II. Discussion

### A. American

■ The first and perhaps most difficult question we face with regard to defendant American is one of choice of law. Plaintiffs argue, and the District Court agreed, that federal maritime law must govern. The District Court concluded that the strong interest in uniformity in maritime matters generally, and in the treatment of injured seamen in particular, counsels a single rule of admiralty on this question. American contends that the question is really one of insurance law, ordinarily the province of the states, and should be decided here according to New York law.

The starting point for our analysis is *Wilburn Boat Company v. Fireman's Fund Insurance Company*, 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955), in which the Supreme Court faced the precise question of what law to apply to the interpretation of a marine insurance contract. *Wilburn Boat* involved a dispute between an insurance company and the owners of a small houseboat destroyed by a fire on a small artificial lake located between Texas and Oklahoma. The company denied liability for the loss on the grounds that the owners of the boat, who had used it to carry paying passengers around the lake, had breached a warranty in the policy stating that they would use the boat for private pleasure purposes only. *Id.* at 311, 75 S.Ct. at 369.

■ Although the Court noted that the insurance policy was "a maritime contract" and therefore within the federal jurisdiction conferred by the Admiralty Clause of the Constitution, it concluded that "it does not follow ... that every term in every maritime contract can only be controlled by some federally defined admiralty rule." *Id.* at 313, 75 S.Ct. at 370. The Court reasoned that when admiralty law intersects with a field traditionally left to regulation by the states, such as insurance, and when Congress has passed no federal statute on the question, the Court must ask two questions: (1) is there is a judicially established federal admiralty rule that governs the issue, and (2) if not, should the court fashion one? *Id.* at 314, 75 S.Ct. at 370. If the answer to both questions is no, as it was in the case of *Wilburn Boat*, state law may govern the question, despite the existence of admiralty jurisdiction.

Some courts have mistakenly read *Wilburn Boat* to mean that *any* question related to marine insurance must be answered under state law. *See, e.g., Ahmed v. American S.S. Owners Mut. Protection and Indemnity Ass'n*, 640 F.2d 993, 996 (9th Cir.1981), *cert. denied after remand on other grounds*, 464 U.S. 826, 104 S.Ct. 98, 78 L.Ed.2d 103 (1983); *Liman*, 299 F.Supp. at 108. If that were the case, we would apply New York law and our analysis would end here. *Wilburn Boat*, however, does not so hold. Rather, it provides a method by which to resolve the question of choice of law in maritime insurance disputes. Therefore, we proceed with the two-step *Wilburn Boat* inquiry on the facts before us.

We ask first whether there is already judicially established federal admiralty law governing the right of an injured sailor to sue directly his former employer's indemnity insurer. Except for the ruling in this case by the court below, no federal court appears to have fashioned a federal maritime rule that provides such an affirmative right. Indeed, if any rule could be said to exist, it is the holding of the Fifth Circuit that direct actions are *not* allowed. *See Conoco v. Republic Ins. Co.*, 819 F.2d 120 (5th Cir.1987) (finding a bar to direct actions based primarily on contract interpretation rather than devising explicit federal admiralty principles); *Continental Oil Co. v. Bonanza Corp.*, 677 F.2d 455 (5th Cir.1982) (same). For the purposes of the *Wilburn Boat* analysis, we find that no

clearly articulated federal principle either permits or prohibits the right of direct action sought by plaintiffs.

We ask, then, whether we should fashion such a rule. We agree with the District Court that the circumstances here differ markedly from those in *Wilburn Boat* and that a single maritime law solution would be preferable to a hodge-podge of state law rules. In *Wilburn Boat,* as Justice Frankfurter noted in his concurrence, the "demands of uniformity relevant to maritime law" were significantly diminished by the fact that the case involved a single houseboat on a small lake between Texas and Oklahoma. *Wilburn,* 348 U.S. at 322, 75 S.Ct. at 375 (Frankfurter J., concurring). The case fell in the category of matters that are "so predominantly restricted in their significance that a uniform admiralty rule need not be recognized or fashioned." *Id.* Moreover, the issue at the center of the *Wilburn Boat* controversy related generally to the business of insurance, and was not particularly maritime in nature. It did not, for example, affect "the interests concerned with shipping in its national and international aspects." *Id.*

In contrast, the present case involves a large class of mariner plaintiffs who were injured on the high seas during the course of many years. It affects the interests of not only a single shipowner and insurer, as in *Wilburn Boat,* but a whole class of claimants who have been deemed entitled to "special solicitude," *American Export Lines, Inc. v. Alvez,* 446 U.S. 274, 285–86, 100 S.Ct. 1673, 1679–80, 64 L.Ed.2d 284 (1980), as "wards of the admiralty court," *Miller v. American S.S. Owners Mut. Protection and Indemnity Co.,* 509 F.Supp. 1047, 1051 (1981) (citing *Garrett v. Moore–McCormack Co.,* 317 U.S. 239, 247–48, 63 S.Ct. 246, 251–52, 87 L.Ed. 239 (1942)).

Equally important, the defendant Associations are entities peculiar to the maritime setting. "A protection and indemnity association is not a traditional insurance company; it is a group of shipowners who have agreed to insure one another's vessels for the mutual benefit of all." *Psarianos v. Standard Marine, Ltd., Inc.,* 728 F.Supp. 438, 451 (E.D.Texas 1989). The associations function in a non-profit manner. They do not pay

"premiums" in the way that insureds pay premiums to their insurance carrier. Rather than pay premiums, the members of associations pay "advance calls" to cover claims for the year; when claims exceed funds available, members must pay "supplementary calls" to make up the shortfall. *See* Norman J. Ronneberg, Jr., *An Introduction to the Protection & Indemnity Clubs and the Marine Insurance They Provide,* 3 U.S.F. Mar. L.J. 1, 10 (1990/1991). Shippers band together in these associations because the unusual risks of the world-wide shipping industry render private insurance largely unavailable.

For these reasons, the maritime protection and indemnity policies at issue here are readily distinguishable from the insurance policy at issue in *Wilburn Boat.* Whereas the dispute in *Wilburn Boat* might have occurred over an on-land structure as readily as over the houseboat in question, the instant conflict is uniquely maritime in nature and demands a uniform rule in admiralty.

▪ The uniform rule we apply in this case is narrow. The central problem is one of timing. The long-latent effects of asbestosis did not become apparent to plaintiffs until after their former employer—the entity arguably liable for their injuries—went bankrupt and was out of business. The narrow question presented is whether, five years after the close of the bankruptcy of a member, a maritime protection and indemnity association with a "pay first" clause in its contract is liable to seamen in direct actions. We conclude that the "pay first" clause in this contract may not be set aside and that it defeats plaintiffs' cause of action. The pay first clause is a clear provision of the contract and, absent more compelling facts than are presented here, it must be enforced.

We recognize that our decision here deprives the plaintiffs of compensation for their injuries with respect to States. (Defendants allege, and plaintiffs do not deny, that these plaintiffs maintain actions for personal injury against other, solvent companies.) It may be that defendant American receives some windfall from not having to pay a claim for which they would be liable had States survived and paid it. But the clear "pay first" language of

the contract limiting the Association's liability takes precedence over the solicitude of the maritime law for its seamen. On these facts, there is no valid policy reason to ignore the explicit language of the contract or to contrive a set of legal fictions to avoid its purpose.

### B. West of England

◼ Our decision not to create a right of direct action in admiralty does not dispose of this matter with regard to defendant West. Although we have found no grounds in American admiralty law for a rule setting aside the "pay first" provision of these contracts, it does not follow that plaintiffs have no rights of arbitration under the contract with West. The key differences are that States' contract with West contained both a choice of law clause and an arbitration clause, provisions not present in the contract with American. West, therefore, has both the right and the obligation to arbitrate disputes brought by parties claiming rights under the contract. In this case, plaintiffs claim the right to stand in States' shoes as beneficiaries of the indemnity contract and to recover for their injuries at sea. It is up to the arbitrator to decide the merits of the arbitral dispute, including the right of the plaintiffs to arbitration. It is up to the arbitrator, not this court, to determine the type of arbitration that the customs of the maritime industry allow.

◼ We agree with the rule stated in *Cheshire Place Associates v. West of England Ship Owners Mutual Insurance Association*, 815 F.Supp. 593, 597 (E.D.N.Y.1993): "When a plaintiff 'bases its right to sue on the contract itself, not upon a statute or some other basis outside the contract, the provision requiring arbitration as a condition precedent to recovery must be observed.'" *Id.* (quoting *Wells Fargo Bank International Corp. v. London Steam–Ship Owners Mutual Ins. Assoc.,* 408 F.Supp. 626, 630 n. 10 (S.D.N.Y.1976)). Here, plaintiffs have no conceivable claim against West that does not derive from the contract between West and States. Even the District Court, with its willingness to fashion sweeping remedies, recognized this fact: both the right of direct action and the Liman-like plan ordered by the court are grounded in the contractual relationship between States and West. For that reason, the claim must be adjudicated according to the contract's provisions; in this case, it must be referred to an arbitrator in England and decided under British law in accordance with the choice of law provision in the contract.

Enforcing the arbitration clause in this case follows the strong policy of federal law favoring arbitration. *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983). The Federal Arbitration Act "provides that written agreements to arbitrate controversies arising out of an existing contract 'shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for revocation of any contract.'" *Dean Witter Reynolds Inc. v. Byrd,* 470 U.S. 213, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985) (quoting 9 U.S.C. § 2). The Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. §§ 201–208, an amendment to the Federal Arbitration Act, requires enforcement of arbitration clauses in international contracts unless the clause is null and void. Although plaintiffs were not parties to the contract between States and West, if they are going to try to enforce it, they are subject to its terms and to the international law governing its terms.

Applying English Law, as the West rules would require, yields the same result. England's Third Party Act of 1930 provides a right of direct action for third parties against insurance companies where the insured is bankrupt. It does not, however, "put a third party in any better position as against an insurer than that of the insured himself." *Firma C–Trade SA v. Newcastle Protection and Indemnity Association (The Fanti); Socony Mobile Oil Co., Inc. v. West of England Shipowners Mutual Insurance Association (London) LTD (The Padre Island),* 2 All E.R. 705 (1990). In a dispute with the insurer, therefore, the third party is no less bound by the arbitration clause than the insured would have been. Similarly, the insurer is bound to arbitrate with the third party just as it would be against the insured.

For these reasons, we order the action against West of England dismissed without prejudice, pending the outcome of arbitration in England. Although this court may have occasion to review the arbitral award later pursuant to the Convention, the arbitrator in London should consider this case in the first instance.

### III.   Conclusion

For the foregoing reasons, we REVERSE the decision of the District Court with respect to defendant American and we dismiss the action without prejudice against defendant West pending arbitration in England. We also REVERSE the appointment of the trustee-receiver for States.